Good morning. Robert Rexford from Mr. Cramer. With the panel's permission, I'd like to focus on the Feretta issue specific to Mr. Cramer. There's a joint case here of Ronnie Lee Houston, and there's a shared issue of a denial of a self-defense, defensive trial, but the Feretta issue is specific to Mr. Cramer. I'd like to focus on that. Look, you know, I mean, I get it. Feretta can be a real pain. Justice Blackmun's dissent in Feretta itself really did a good job of outlining some of the problems that would come up by recognizing a Sixth Amendment right to self-representation. But we're either going to honor the principles in Feretta or we're not, and the district court just didn't do that here, and I'm asking this panel to correct that. The rule is pretty straightforward. A timely, unequivocal request for self-representation that's not made for the purposes of delay has to be granted. Mr. Cramer's request was certainly timely. It was about two months shy of the then-scheduled trial date, so obviously a jury hadn't been enpaneled. It was unequivocal. He filed a motion. He filed an actual declaration that he initialed and signed, and there's no indication that it was done for purposes of delay. The government sort of half-heartedly in their answering brief says maybe Mr. Cramer asked to represent himself because he wanted to stay in pretrial status in Southern California. Mr. Cramer withdrew it, right? The issue was the district court didn't deny it. The district court just said you get 11 weeks. Do you still want to go forward? And he said no. Yes. So the issue is really 11 weeks, and whether that was a constructive denial. Isn't that your argument? Yes, but I disagree whether 11 weeks is the actual issue here. That's the government's position, that look, hey, the district court never got around to actually denying the motion, so the only thing that this panel can review is the length of the continuance. That's just a reformulation of the argument the government made in Farias, the main case that I'm relying on, which is probably well-known to this panel. But in those cases, the district court said tomorrow we're going to start the trial. It was like 24 hours. Both of those cases was the same day or 24 hours. Yes. This was 11 weeks. It was. But there's a difference. Two points to that, Your Honor. In both Armand, I believe is the name, and definitely Farias, the request for self-representation came the day before trial. Under our case law, as long as the request is made essentially before the jury is sworn, it's timely. Exactly. Well, it's timely, but that doesn't mean the district court has to grant it. I think it did, and here's why. Like I said, this idea that the only thing this panel can review is the propriety of not granting a continuance is just a reformulation of what the government said in Farias. I thought Mr. Kramer withdrew it. He did. The district court neither granted nor denied. Mr. Kramer withdrew his request. Isn't that right? He did. Just as the defendant in Farias withdrew his request for self-representation. But as this court put it in Farias, the government's argument, and I think it is the same argument, took too limited a view of the Sixth Amendment right to self-representation. It's not just that you have a right to represent yourself. You have a right to meaningfully represent yourself. So does the district court have to grant whatever extension the defendant requests? No. And anything less than that would be a denial? Is that your position? No, it's not. Certainly not. Then how do we determine what's reasonable? And why was 11 weeks not reasonable? Well, I think we can do that here for two reasons. What is a meaningful opportunity to prepare for self-representation is going to depend on the context. Obviously, 24 hours, as was the case in Farias, just isn't enough, even for, let's be honest, I mean, I'm a trial attorney in the Southern District. 1326s are not the most complicated trial cases. Complicated cases, just not complicated trial cases. Here we know certain facts. Mr. Kramer, along with his request for self-representation, asked for a continuance of six months. Why he did that, I don't know. But at the same time, he's asking for certain things. He's asking for discovery from his lawyer. He's asking for more access to time in the law library. And he's asking to keep the investigator that had been working on his case. And as you go through his pleadings, it's because he thinks that this can move the process forward. To directly answer your question, no, the district court doesn't have to grant any request made by a defendant. But what a district court does have to do is they have to meaningfully engage a person as to, hey, why do you think you need six months? Because remember, when you read through the Ferretti hearing, it is preceded by a long discussion between the court and the two defense attorneys. The two defense attorneys had their cases for six and seven months, respectively, at that point, at that hearing. And they were asking for an additional four to five weeks. So is your position that the district court has an obligation to engage in a colloquy with the defendant who asked for a Ferretti representation? Is that your view? No. My position is, under this court's precedent, that at the moment he made that request, the court was under an obligation to grant the Ferretti motion. There are two separate issues of whether or not the district court's refusal to engage in a conversation about how much time was necessary. Excuse me, counsel. I know you're in the middle of a thought, but you basically just answered a question that Judge Ikuda asked you earlier. She asked you whether if somebody stands out there and asks the district court for a continuance, does the judge have to grant it? You said no. Well, just now you said as soon as he made the request, he had an obligation, the judge had an obligation to grant it, which sounds to me like you're answering Judge Ikuda's question now. Yes. I'm sorry. I'm not trying to confuse. Maybe I'm just confusing. I may have. I probably stated that inarticulately. A judge does not have to, by definition, grant the amount of time a criminal defendant believes he or she needs to meaningfully prepare for trial. A timely request for self-representation when there's no indication that it was done for purposes of delay, that must be granted. To my mind, those are two different issues, two different things. So the issue really boils down to is when Mr. Kramer withdrew his request for self-representation, had the district court put him in a position where his right of self-representation was equally as meaningless as the right of Mr. Farias and Farias? I still don't understand what you're – what do you expect a district court judge to do? Say, are you sure you want to withdraw your request? What I expect – I just want to make sure I heard you right. You want to withdraw your request. No, sir. What I would expect the district court to do is to address the Feretta issue before setting a trial date based solely on the court's – I can't remember the sequence here, but had the new trial date been set or were they going to set the new trial date at this time? This is the sequence, and the sequence is important. Everybody shows up. The district judge goes, hey, Mr. Kramer, are those issues still live? Are those still – is he still asking for self-representation? Mr. Kramer's lawyer says, yes. Then the district court says, under no circumstances, under any circumstances, am I going to grant a six-month continuance? Then the next thing that happens is an elongated discussion where two lawyers and a judge are comparing calendars to figure out how much additional time the lawyers need, and they settle upon a July 19th trial date. It ends up being July 26th, but the one date before the actual Feretta hearing is a July 19th. So the next thing in the sequence is the Feretta hearing itself, and the district judge says to Mr. Kramer, look, I just want to be clear. I'm not continuing this six months. Do you still want to represent yourself if this goes to trial in July? And that's when he withdraws it, and that's the problem, because at that point, what Mr. Kramer – what Mr. Kramer knows is that the July date is the minimum his lawyer thought he needed, and his lawyer had had the case for six months before then. This is a man in a local lockup with four – So is your point that the judge should have said, well, why do you need more than 11 weeks? Would that have been preferable? Sure. My point is that you don't condition a man's right to represent himself based on the trial schedule of attorneys. It was just backwards. I don't know. Some judges – this judge was pretty generous, willing to work with the lawyers. I mean, some judge will – he just said, we're going to trial in 30 days. I mean, you've said it yourself, counsel. This is not the most complicated case in the world, right? No. So the judge – you didn't say that? I didn't. I'm sorry. I must be mumbling or not speaking clearly. I thought I – I swore I thought I heard you say that you didn't think this was the most complicated case. A 1326 charge, as was the case in Farias, is not a complicated case. This is an assault to commit murder. Right. So this was a fairly complicated case. Yes. Okay. This is what I was trying to clear up here. Yes. And what we do know are two lawyers that had the case for months still needed additional time. How can Mr. Kramer think to himself, look, if you do the math, it's about eight or nine weeks from the moment of the Feretti hearing to the actual trial. At four hours a week in the law library? That's 35 hours? I thought the district court and the government were both agreeing to more time in the library if Mr. Kramer requested. There is some discussion towards the end, but that is after Mr. Kramer has withdrawn his self-representation request. Unsuccessfully, I fear, I'm trying to place us all in Mr. Kramer's position at the time that that district court says, I'm not continuing it six months. You want to represent yourself if this case goes to trial in July. What is Mr. Kramer thinking at that moment? The only thing he can be thinking is, my lawyer, who has had more time than I have, he's not ready. Conceivably, how could I prepare my defense in eight, nine weeks if my lawyer needs those eight or nine weeks and my lawyer has already had my case for six months? Well, the judge said, I'm not going to continue it for six months. He didn't, to my recollection, say, I'm not going to continue it past July. No, he did say that, Your Honor. Did he say that? Yes, it's in the first ER. At that point, he said that? At the end of this hearing, when the FRED issue is finally addressed, and I'll paraphrase this and I'll pull the exact ER site because I'm confident of this. Was this before or after he had withdrawn his request? Before. This is the statement by the district court that immediately precedes Mr. Kramer. What's the statement? I want to tell you that I'm not going to continue this for six months. Do you still want to represent yourself if this case goes to trial in July? That's not a statement of someone saying, hey, I'm not going to give you six months, but you know what, I understand that you have a right to meaningful self-representation and we're going to make sure that happens. That's, hey, do you think you can be ready in July? Because that's when you're going to trial. And I understand that Mr. Kramer, look, I understand that Mr. Kramer was facing charges. I think it was out in Tennessee and it took a while to bring him to the central district. It doesn't negate the fact that this case lingered. No one was in a hurry to get this case to trial until Mr. Kramer asked to represent himself. I think it is the same as Farias. The numbers are different, but when you're thinking in terms of – No, there's a big difference. I mean, it was the determining factor there was that he had to go to trial the next day. Yes, and as the court wrote – The memory was there. As the court wrote, you know, didn't need to decide in that case what was a sufficient amount of time to meaningfully exercise your right to self-representation. 24 hours wasn't enough. Yes, because that wasn't even a close call. I think I'm speaking as only somebody who's been privileged to sit with panels of the Court of Appeals. For the last 25 and a half years, I've been a federal judge, and I'm not a member of the Court of Appeals. But in my viewing Court of Appeals decisions, particularly in this learned circuit, I can tell you that it seems that the Court of Appeals over the years has been reticent to give a blank check to defendants to manipulate the system. And the problem with your argument, even though you're using the particular facts of this case, is that if in practical application were this court to write a decision in a manner in which you would suggest, it would almost invite defendants to hop in and out of counsel. And then the district courts would be in the horrible position of saying, well, let's see, this is, well, it isn't 24 hours, but the other one was 11 weeks, and then what about this six months, and what about five weeks, and what about two weeks? And it becomes, I mean, I myself have had defendants where they manipulated the system to a point where I had one who had had years' worth of continuances on the state side. He was indicted on the federal side. He had several continuances there and then showed up on the day of jury selection and said, I want a new lawyer, which I denied. He was convicted. The conviction was affirmed, and habeas was denied, and that was affirmed. But in that case, there was a, you know, people do that. You know that. You're a defense lawyer. I am a defense lawyer. I don't mean to, you know, I want you to respond, but I want to make sure. Is your co-counsel? Mr. Mr. Houston's counsel. Is he going to argue? He is, and I'm sorry. I'm burning time. You're burning up his time. He's down to four minutes and 13 seconds. My question can, it's all right. You don't have to answer my question. I share the court's concern. It's not an issue here because we know how much time it took to prepare this case for trial because we know how much time the attorneys had and how much they were requesting to do it. So that's why the request of six months was not a manipulation. Morning, Your Honors. I represented Mr. Houston at trial, and now I represent him here. Mr. Houston was prepared to present fully a claim of self-defense. As I'm sure you're aware, he testified in his trial. We interviewed, and we had available to testify on his behalf, two individuals who were sitting in the recreation cage, joining the cage where Mr. Kramer and Mr. Houston assaulted Mr. Justice. I thought this was a claim of anticipatory self-defense. No, Your Honor, and there is the point I need to jump off. Mr. Houston never embraced that. I represented Ron's pure self-defense. There was an immediate threat. He perceived an immediate threat. He reacted on an immediate threat. It has to be reasonable. Well, his testimony is that he acted in a reasonable way. Certainly that would be a claim. What did the evidence show? Well, the evidence was that he attacked Mr. Justice and dragged him to the ground. Well, the district court was focusing on immediacy, but the other prong is proportionality, and I think all of us watched the video, and there he's stabbing or participating in the stabbing of him that goes on, as the district court said, the never-ending assault. And so the district court, looking at both the immediacy and presumably the proportionality, said there's no evidence to support. Your Honor, I believe Judge Fees focused on preemptive strike. The government pushed him in that direction. The initial pretrial rulings, the evisceration of Mr. Houston's purported defense, was all as a result of the government portraying Mr. Houston's intent to present preemptive self-defense. At no time did we ever take that position. We intended to not only have Mr. Houston testify, which he did, but then we had witnesses who were in the adjoining cell who actually, based on our interviews with them and our discovery, reciprocal discovery to the government, they were not only precipient witnesses, but they were participatory witnesses in that they were part of the reason that Mr. Kramer was being targeted by the Dirty White Boys prison gang, that they were members of, Mr. Wiggins and Mr. Shaw. But I thought even with their testimony, I mean, he was still, the knife was in his pants, and so you can see why the district court said it doesn't meet the standard for self-defense. What was wrong with that? Well, Your Honor, one could almost look at the previous assault that Mr. Houston was involved in, in December of 2007, where there was again, Mr. Houston was involved in stabbing Mr. Thomas. He had disarmed Mr. Thomas. It was his testimony. But you did get self-defense for that, yeah. And we think actually, our position is that by isolating and in fact informing the jury, I believe it was Jury Instruction 25, that self-defense was appropriate in the McHale-Thomas assault, but absolutely not appropriate in the Scottie Justice assault. What the court did was almost direct a verdict. And on top of compounding what I call now a directed verdict, was that the court prevented Mr. Houston from testifying that he acted in self-defense. I mean, we all, anybody who practices criminal law, anybody who presides in criminal cases, it's very unusual for a defendant to get on the witness stand. And we all know that. Mr. Houston got on the witness stand to testify. Our position is that the court, the government encouraging the court, the court limited Mr. Houston's testimony, limited ultimately the proffer of his corroborative witnesses, Wiggins and Shaw, and then basically directed a verdict that he was not entitled to self-defense. Any kind of claim of self-defense was not going to be considered or even be mentioned to the jury. Put that in the context that the government did not present Scottie Justice or Mr. Loeffler, who were in the cell. Mr. Justice was the victim. He never testified in this case. Counsel, you wouldn't disagree with the proposition that under Ninth Circuit law, the district court does have a gatekeeping kind of a function with respect to self-defense, right? Your Honor, absolutely. Because otherwise, you know, you'd get beat. I'm not going to dispute that. But here we have a gentleman who was literally on the witness stand, and he was told that his testimony would be limited, that he did not intend to kill Mr. Justice, but that he could not mention self-defense. And, yes, I recognize that the court has a gatekeeping position. But what's interesting is that our corroborative witnesses, Houston's corroborative witnesses, Wiggins and Shull, they're actually transported from the USP Canaan and USP Allenwood to the Central District for purposes of testimony, and they were only not the decision for them not to testify was only made the evening before Houston presented his defense. Did Mr. Houston testify that he didn't have the knife before he went into the rec room? Your Honor, I believe Mr. Houston testified that he did not have the plastic knife. Yes. So where did it come from? Well, where do I think it came from, or where did I think it came from? What did the evidence show? The evidence showed that at some point it was found in the cell. It was found in the rec cage. I think if one looks at the video, you can see Mr. Houston towards the end of the assault is punching or hitting Mr. Justice. Interesting, there was no direct nexus to puncture wounds or any kind of wounds caused by the plastic knife. But it didn't get there by his finger. No, it didn't. There's no dispute that Mr. Justice suffered. Multiple stab wounds from a metal, from the metal long spearing type nail that Mr. Kramer was using. But Mr. Houston was grotting the guy and strangling him while Mr. Kramer was hitting him. He did assault him from behind and yanked him down to the ground, and he used his exercise rope to do that. Again, our focus in the trial was to have Mr. Houston explain himself as to what his state of mind was. I think the last thing that was certainly involved in the pretrial proceedings and came out through some of the testimony is that there had been an explosion of violence at the USP Victorville, that there was the Aryan Brotherhood and the Dirty White Boys, the Nazis, the Nazi Low Riders, and the Skinhead Gangs had gotten into a rather violent dispute with one another. All right, I'll let you go way over. Thank you. Thank you. May I please the court. Curtis Kinnaman, House of the United States. I guess I'd like to start first with self-defense. In this particular case, I think the district court almost gave two bites of the apple in terms of self-defense. First, the district court ruled that there was no such thing as preemptive defense. When defendants said, no, no, no, no, that's not what we're arguing. We're arguing traditional self-defense. Then there was a full hearing as to traditional self-defense. And the district court did exactly what it was supposed to do, is it accepted as true the full proffer by the defendants as to what they would testify to, as to what other inmates would testify. The district court accepted it as true, looked at the entire record that would be proffered at trial, including the video, and found, as the standard is here, that no objectively reasonable person would believe that self-defense was necessary. In that, self-defense could not be made out by the defendants as to both elements with respect to immediacy. The district court never went as far as to say that the use of force was reasonably necessary, but I think this court, if it has any concerns about the immediacy finding, can affirm on that other basis. And I think quite clearly, based on the proffers and the video, makes out very much so that the force used by Defendant Houston, who first strangled the victim justice, and then Defendant Kramer, who then started stabbing him, that that was beyond the force that would have been reasonably necessary, if in fact self-defense was even allowed because there was some sort of immediate threat. So I think as far as self-defense goes, the district court did exactly what it was supposed to do. It credited as true the entire proffer, and it made that decision, and I think that that should stand. With respect to the Sixth Amendment right to self-representation, I think the issue here was, in fact, did the continuance, or the limited grant of the continuance that was requested, did that constitutionally affect the Defendant Kramer's request to represent himself? I think in this particular case, no, this was not a constitutionally, if you will, offensive denial of continuance. And in fact, when you look at the hearing that was in May, as I think Judge Pius pointed out, the 11 weeks that Defendant Kramer would have had to prepare for trial of self-representation was, by some standards, generous. And certainly it may not have been the continuance that Defendant Kramer wanted, and it may have been a more difficult choice to decide whether he was going to represent himself with only 11 weeks to prepare, as opposed to the six months that he wanted. But quite frankly, that doesn't mean that he was constitutionally deprived under the Sixth Amendment of the right to represent himself. It was not a constitutionally offensive, if you will, partial grant of a continuance. And as this Court has recognized, it is well within the broad discretion of the District Court to grant or deny continuances and decide with respect to its scheduling and weighing the various factors as to what is appropriate. And here, certainly, there was 11 weeks. I think counsel's argument, and I hope I'm getting it right, is that his client was faced with this Hobson's choice of either representing himself and then having this objectively unreasonable, I think that's where the issue is, objectively unreasonable amount of time, versus just going ahead with his lawyer and hoping for the best, even though he didn't want the lawyer. He wanted to represent himself. Yeah, I do think that is the argument. But quite frankly, it wasn't and did not amount to a Hobson's choice. When you look at what this Court has said as to what it is that would be so meaningfully deprived, if you will, the defendant of his right to self-representation, it's the cases like Armand and Farias when you're talking about one day when the District Court was very much very clear that if you want to represent yourself, that's fine. You have that absolute right. However, it's tomorrow, and we're going to trial tomorrow. And I think that it was Judge Burns in San Diego that made that choice or that Hobson's choice. Here it's quite different. It may not have been the continuance to his liking, but we are talking about an 11-week continuance. And in fact, if you look at the record, after deciding what the appropriate continuance would be for this particular trial, as well as I believe even the proffer by the government was that it would merely be a three-day trial, so 11 weeks would seem sort of appropriate based on that. And this had been a case in which the defendants had made their initial appearances, I think, back in early 2010. So they had had discovery. This case had been ongoing. There had already been litigation about self-defense. I think 11 weeks under these circumstances was not an abuse of discretion. Was there any evidence in the record of open hostility or non-cooperation between the defendant and his lawyer such that, for instance, the defendant wouldn't have been able to get materials or other things from the lawyer? No, Your Honor. There's an absence of that in the record. And quite frankly, there's an absence of any problems at all that the defendant Kramer had with respect to the continuance. If he had wanted a greater continuance, one might have thought after the district court had said it's going to be in July that there might have been anything that the defendant might have offered in terms of 11 weeks as inappropriate or not enough for me because of X. And there was no such offer or proffer or explanation why more was needed. I was looking for that, and I didn't see it. And I can tell you from my own experience, defendants are not shy about talking about their lawyers. I think that's right, Your Honor. I think neither of these defendants are shrinking violets, and they knew how to assert what they wanted and make the request, and they didn't. And so I think it's really telling, in fact, that Defendant Kramer, when he was told that it was going to be a July trial, never again asserted why six months was appropriate for him or why, even more importantly, why 11 months was inappropriate. So there really was no Hobson's choice here. Defendant Kramer maybe had a hard choice by his standards, but at the end of the day it was not an unconstitutional Hobson's choice that he had to make. In terms of the other issues that weren't spoken about here, I would just briefly submit that with respect to the appointment of counsel for the witnesses here simply didn't rise in any way to the level of the, quote-unquote, substantial interference that this court has found when it is found that the prosecution is somehow interfering with witness rights. All that happened here is that the government suggested that the potential witnesses may be implicating themselves. They may have Fifth Amendment rights. And that was only said to the court. There's an absence of this record of any interference or even any contact between the government and the witnesses or the witnesses' attorneys. There's not even any sort of strong-arming by the district court. When we get to the hearing about whether or not the particular witnesses at issue were going to invoke their Fifth Amendment rights, all the district court does is ask Mr. Belter, on behalf of Defendant Houston and Kramer, what is it that you believe are the areas of inquiry for these witnesses? Mr. Belter gives a brief summary of what it is that he intends to elicit. The court then turns to the witnesses and their attorneys, asks them, do you wish to assert your Fifth Amendment rights against self-incrimination? And they say yes. And that was the end of it. There simply was no substantial interference. And then finally, as to the last claim, as to the Thomas assault, under Jackson v. Virginia and this court's en banc case in Nevels, simply there was ample, more than ample evidence for any reasonable juror to have found that the Defendant Houston did in fact assault Thomas, that there was not self-defense here, especially with all inferences in favor of the government. Thomas himself, the victim, in fact did testify as to the fact that it was Defendant Houston who stabbed him in the back and attacked him first. The jury was entitled to credit it as it did. And, in fact, it was corroborated by and entirely consistent with the other evidence, which was, for example, the fact that Thomas had injuries and stab wounds to his back, consistent with how he testified, and there were, in fact, no injuries whatsoever at Defendant Houston. That was also consistent with the surveillance video as Thomas and Houston, if you will, pour out of a Defendant Houston cell. And, again, you have Thomas sort of crawling down. I think they even call it a crab walk trying to escape Houston as Houston, holding the knife, is going after him. And, again, when they get to the lower level, as the Bureau of Prison Personnel testify, they ask Mr. Houston to set down his weapon, and he delays and doesn't obey them right away. All of that is consistent with the jury's finding that, in fact, Thomas was assaulted. There was no self-defense. Unless this Court has any questions, the government would submit. Thank you. Thank you very much. One minute. The government is simply incorrect that the district court credited as true the entirety of the defense proffer. You can read through the court's order as much as you want, and nowhere does the court mention Mr. Kramer's proffered testimony, that he was told that the putative victim had a knife and was going to attack him. So to the extent that there's this sneak attack by Mr. Houston against Mr. Justice doesn't apply to Mr. Kramer. Because by the time he's turning around, he sees a struggle, he's proffered that he has been told that Mr. Justice is going to attack him with a knife. As for proportionality, that's a jury call. What I can do in a bar fight, what's reasonable in a bar fight, is probably really different than what's reasonable on a prison yard. To answer your question, sir, excerpt of record 33 is where the district court conditions Mr. Kramer's right to self-representation based on a July trial date. One final point. I don't care. I wasn't disagreeing with you. What I was saying is that you were suggesting that your client was put in a Hobson's choice, and I wanted to hear the government's response. Am I wrong? No. I'm sorry. You asked me whether there was an explicit July condition. But that was before. You already responded to that. Yeah, but I just wanted to make sure that I had the citation right. I just want to reiterate it. Okay. Second, it doesn't matter how long this case was around or when discovery was, because the only relevant period of time under this court's precedent, footnote 4 in Farias, as to what time Mr. Kramer had to prepare was from his request and whether it was granted to the end of the trial date. So we're talking a matter of 8 to 11 weeks to prepare for an assault with intent to murder case. Okay. One minute. Your Honor, it's our position that Mr. Houston, he should have been permitted to give full testimony as to his state of mind and his perceptions and observations before he acted in the recreation cage. And what happened is that the district court limited his testimony based on proffers made before trial. But it's our position that the proffers made before trial, in essence, established very clearly that he acted in face of an immediate threat that he perceived based on everything that he had experienced in the months leading up to the recreation cage encounter. Okay. Thank you. Thank you, counsel. We appreciate your arguments on all sides and matters submitted.
judges: Ezra, Paez, Ikuta